IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MATTHEW EDWARDS, | : | HON. JEROME B. SIMANDLE |
| Plaintiff, | : | Civil No. 10-5214 (JBS/JS) |
| v. | : | |
| | : | **OPINION** |
| PANTHER TECHNOLOGIES, INC., et al., | : | |
| Defendants. | : | |

APPEARANCES:

Paul Calvin Lantis, Esq.
Ari R. Karpf, Esq.
KARPF, KARPF & CERUTTI, P.C.
3331 Street Road, Suite 128
Two Greenwood Square
Bensalaem, PA 19020
    Attorneys for Plaintiff Matthew Edwards

Rudi Gruenberg, Esq.
704 East Main Street
Bldg. E
Moorestown, NJ 08057
    Attorney for Defendants Panther Technologies, Inc., and
    Peter J. Palko

**SIMANDLE**, Chief Judge:

I.  **INTRODUCTION**

    This matter is before the Court on the motion of Defendants
Panther Technologies, Inc., and Peter J. Palko ("Defendants") for
summary judgment. [Docket Item 32.]  The instant action arises
out of the circumstances in which Plaintiff Matthew Edwards
ceased his employment with Defendant Panther Technologies as a
Field Technician on September 21, 2010.  The Plaintiff alleges he

was unlawfully terminated because of his back injury and was therefore deemed by Defendants as "no good" as a Field Technician.  The Defendants maintain Plaintiff voluntarily left his position after being given a week to obtain a valid driver's license.  The Defendants argue that a valid driver's license was a prerequisite to employment as a Field Technician and that the Plaintiff, whose license had been suspended for a DUI offense, knew that he could not obtain one and therefore chose to abandon his position.

The Plaintiff brings the instant action against the Defendants for disability discrimination and retaliation under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-4.1, ("NJLAD").  The Defendants have filed the instant motion for summary judgment. [Docket Item 32.]  The main issue before the court is whether the Plaintiff has presented sufficient evidence to establish his claims for disability discrimination and retaliation.

For the reasons discussed below, the court finds that no genuine issues of material fact exist which prevent summary judgment in favor of the Defendants.  As to Plaintiff's discrimination claim, there is no doubt that a rational jury would find that the Plaintiff would have been terminated because he lacked a valid driver's license which was a requirement for his position as a Field Technician.  In addition, the Plaintiff

has failed to present any evidence that he was engaged in a protected activity at the time of his termination, and therefore, Plaintiff cannot sustain his retaliation claim.  Therefore, the court will grant Defendants' motion for summary judgment and the Plaintiff's complaint will be dismissed.

## II.  BACKGROUND

### A. Statement of the Facts and Procedural History

The parties dispute many of the facts surrounding Plaintiff's employment with Panther.  The following facts are set forth in the light most favorable to the Plaintiff, as is required in considering a motion for summary judgment.

Plaintiff applied for a position with the Defendants on October 5, 2007 by submitting an application of employment. (Def.'s Ex. D.)  The application contained the following language:

> **Please note that a valid driver's license is required for employment with the Company.**  Once employed, you will be responsible to maintain a valid driver's license.  In the event there are any changes in your driver's license once employed, you must notify the Company immediately.  You will also be responsible to provide all certifications required for the position you are applying.

(Def.'s Ex. D.)

The application then required Plaintiff to list "all driver licenses, current, existing or suspended."  (Def.'s Ex. I at D40.)  In response, Plaintiff listed his North Carolina ID, which

3

was not a driver's license, and did not indicate on his
application that his North Carolina driver's license was
suspended.  (Def.'s Ex. I; Edward Dep. at 20:2-22; 29:20-30:4.)
In fact, Plaintiff's North Carolina Driver License was suspended
in 1994 due to a DUI conviction and was never reinstated.
(Edward Dep. at 20:2-22.)

After filling out his application, Plaintiff was then
interviewed by John Coffey, former Operations Manager of
Defendant Panther Technologies, Inc. ("Panther").  (Def.'s Ex. C,
Deposition of Matthew Edwards, January 27, 2012 (hereinafter
"Edwards Dep.") at 22:13-25:23.) During his interview, Plaintiff
disclosed to Coffey that his license had been suspended in North
Carolina because of a DUI.  (Edwards Dep. at 66:11-67:2.)  Coffey
told the Plaintiff that he would "need to get [his] license as
soon as possible."  (Edwards Dep. at 28:16-17.)

Plaintiff was hired by Defendants as a Field Technician on
the same day he applied.  (Pl.'s Counter-Statement of Material
Facts ¶ 1; Def.'s Ex. C, Edwards Dep. at 24:23-25:23.)  Upon
accepting the position, Plaintiff received a copy of Panther's
Employee Handbook.  The Employee Handbook states:

> It is the responsibility of each employee to promptly
> notify Panther of  any such changes in personal data,
> personal  mailing address, telephone numbers, number of
> names of dependents, individuals to be  contacted in the
> event of an emergency, and status reports should be
> accurate and current at all times.
>
> . . .

4

> Panther relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data  presented throughout the hiring  process and employment. Any misrepresentations, falsifications or material omissions in any of this information or data, whether intentional or not, may result in Panther's exclusion of the individual from further consideration for employment, or if the person has been hired, termination of employment.

(Def.'s Statement of Material Facts ¶¶ 13, 14; Def.'s Ex. E, Employee Handbook at 10 ¶¶ 6.4 and 6.5.)  Plaintiff testified in his deposition that he reviewed the manual and did not have any questions about any of the provisions therein.  (Edward Dep. at 41:10-15.)

Further, in accepting the position as Field Technician, Mr. Edwards signed an Offer of Employment on October 5, 2007. (Def.'s Ex. D.)  This Offer of Employment contains the following language:

> You will be required to get your driver's license reinstated within 90-days and must maintain it in good standing in order to continue your employment with **Panther**.  You can not operate a Company-owned vehicle until after your license has been reinstated.  Your driver's license will be checked bi-annually to ensure such compliance.

(Def.'s Ex. A.)

Coffey reviewed this paragraph with Edwards and explained to Edwards that he was required to obtain a valid driver's license within 90 days.  (Edwards Dep. at 32:4-11.)

The Plaintiff was unable to obtain a valid driver's license in 90 days.  This delay was the result of outstanding DUI fines

in North Carolina.  The Plaintiff needed to pay these outstanding
fines prior to obtaining a valid driver's license in Pennsylvania
where he relocated after accepting his position at Panther.
(Edwards Dep. at 32:12-33:1.)  The Plaintiff did not ultimately
obtain a valid Pennsylvania driver's license until September
2008.  (Id. at 32:17-19.)

     In December 2007, the Plaintiff informed Coffey that he had
not yet obtained a valid driver's license because there were
problems with North Caroline.  (Edwards Dep. at 33:19-25.)  After
this conversation, Coffey and Defendant Palko, the owner and
President of Panther, periodically asked the Plaintiff about the
status of his license.  (Id. at 36:3-14.)  Plaintiff continually
informed Coffee and Defendant Palko that he paid his fines in
North Carolina and was waiting for clearance from his lawyer that
he could obtain his Pennsylvania license.  (Id. at 36:12-14.)

     In February 2008, Plaintiff was given an employment
evaluation.  On the first page of the evaluation, Panther stated,
"Matt is a good employee who needs to get his driver's license so
that he can attain full-time status and operate company
vehicles."  (Def.'s Statement of Material Facts ¶ 26; Edwards
Dep. at 125:4-15.)  On the second page of the evaluation, Panther
stated, "Matt is a good employee . . . his lack of a driver's
license is a major problem and will continue to keep him from
reaching his full potential."  (Def.'s Statement of Material

6

Facts ¶ 27; Edwards Dep. at 125:21-126:1.)  Plaintiff was

evaluated again on July 9, 2008, and Panther again noted that

Plaintiff's lack of a driver's license was an issue.  (Def.'s Ex.

I, July 9, 2008 Employee Review Form.)  From October 2007 until

September 2008 when Plaintiff received his Pennsylvania driver's

license, the Plaintiff was instructed that he could not operate

any company vehicles and Plaintiff did not in fact operate any

company vehicles during this period.  (Id. at 36:15-37:6.)

When Plaintiff Edwards received his Pennsylvania driver's

license in September 2008, he informed Coffey and then waited for

Panther's insurance company to approve the license.  (Edwards Dep.

at 46:12-47:10.)  After Panther's insurance company approved his

license, Coffey informed Plaintiff that he could operate company

vehicles.  (Id. at 47:11-13.)  Plaintiff began operating a Ford

F150 truck.  (Id. at 47:14-17.)  Plaintiff later operated a dump

truck on site in July 2009.  (Id. at 51:11-20.)

On November 9, 2008, Plaintiff committed another DUI offense

in Pennsylvania.  (Def.'s Ex. G, Pennsylvania Driver's Abstract.)

As a result, Plaintiff's license was suspended for one year

effective December 8, 2009.  Id.  The Plaintiff never informed

Defendants about the DUI charge or that he subsequently lost his

license as a result of this DUI offense.  (Edwards Dep. at 58:2-

59:22.)

Instead, Plaintiff continued to operate company vehicles on-

site after December 8, 2009. (Edwards Dep. at 56:20-57:7.)   In
February 2010, two months after his license was suspended,
Plaintiff informed Coffey that he had lost his license "because
of my car." (Edwards Dep. at 57:8-13; 59:14-16.)   During his
deposition, Plaintiff admitted that he had "just made the story
up to Mr. Coffey." ( Id. at 59:21-22.)   Prior to this
conversation with Coffey, Plaintiff's car had been taken from a
job site and impounded because it lacked valid title,
registration and insurance. (Id. at 60:18-61:24.)   Plaintiff
told Coffey that his license would be reinstated in six months.
(Id. at 60:3-12.)

Plaintiff continued to operate company vehicles on-site
after this discussion with Coffey despite not having a valid
driver's license. (Id. at 69:16-24.)   Specifically, Plaintiff
continued to operate an off-road dump truck and did not operate
any vehicle driven on public roads. (Id. at 74:4-11.)
Arrangements were made by the Plaintiff with his co-workers for
transportation to and from job sites so the Plaintiff did not
have to drive to work. (Id. at 83:8-16.)

Sometime after Edwards disclosed the loss of his license to
Panther, he asked Coffey to sign a limited work license
application for him. (Edwards Dep. at 112:6-15.)   Coffey filled
out the requested paperwork for the Plaintiff but his limited
work license application was denied, according to the Plaintiff,

8

because too many vehicles were designated on the form.  (Id.)
Panther provided paperwork for a temporary license on more than
one occasion, and Plaintiff claimed he had missed his window
after one apparent attempt.  (Def.'s Ex. H, Deposition of Peter
Palko, October 28, 2011 (hereinafter "Palko Dep.") at 49:3-
50:13.)  Plaintiff never disclosed to anyone at Panther that his
license was suspended because of a DUI offense.  (Edwards Dep. at
155:24-156:5.)

In July 2010, Plaintiff was asked by Defendant Palko, Coffey
and John Twomey, an owner and vice president of Panther, about
the status of his driver's license.  (Id. at 86:25-87:20.)
Coffey asked Edwards about his license and explained that he
wasn't happy about the situation.  Edwards told Coffey he was
working on it.  (Id. at 88:8-13.)  Sometime in July or August
2010, Defendant Palko asked the Plaintiff about the status of his
license.  Plaintiff told Palko he was working on it.  Defendant
Palko responded by saying that Plaintiff needed to get a valid
license.  Palko further told the Plaintiff that he considered him
a good employee and would to like keep him on for another ten
years.  (Id. at 88:15-89:25.)  At this point, Plaintiff still did
not disclose to the Defendants that he had lost his license
because of a DUI conviction. (Edwards Dep. at 58:2-59:22; 89:6-
9.)

Also at the end of July 2010, the Plaintiff was experiencing

9

back problems.  (Edwards Dep. at 92:5-20.)  Plaintiff's back problem arose in February or March of 2010 and Plaintiff began speaking to his co-workers about his symptoms but did not see a physician and did not inform Panther management.  (Id. at 92:22-93:19.)

In August 2010, Defendant Palko saw Plaintiff in the shop and observed that Plaintiff appeared to be in pain.  (Palko Dep. at 75:9-76:10.)  Defendant Palko asked the Plaintiff what was going on and Plaintiff explained that he was experiencing back problems.  (Palko Dep. at 75:9-24.)  According to Palko's testimony, Plaintiff told him that sometimes his back gets "flared up" and he injured it four months ago "outside of work one weekend."  (Id. at 75:19, 22.)  Plaintiff testified that he told Palko he thought he "may have a slipped disc."  (Edwards Dep. at 95:19-20.)

Defendant Palko then informed John Coffey that he was concerned about Plaintiff's back injury and told Coffey that he wanted Plaintiff seen by a physician because he was concerned Plaintiff's back was inflamed.  (Pl.'s Counter Statement of Material Facts ¶ 32; Palko's Dep. at 75:9-76:10.)  Consequently, Plaintiff was referred to Panther's company physician, Dr. Bojarski, and Plaintiff was seen that same day.  (Palko Dep. at 76:3-17; Edwards Dep. at 95:1-6.)  Dr. Bojarski diagnosed Plaintiff with lower back pain and sent him to get a lower back

10

x-ray and an MRI.  (Palko Dep. at 76:14-79:13; Edwards Dep. at 98:21-23.)  Dr. Bojarski referred Plaintiff to the Rothman Institute to receive additional treatment.  (Edwards Dep. at 132:15-133:9.)  The Plaintiff was also given a week off of work to rest and obtain follow up treatment with a family physician. (Def.'s Ex. B, Def.'s Response to Interrogatory 10.)

While off of work, Plaintiff did not see any other medical professional and remained at home.  (Edwards Dep. at 102:19-25.) The Plaintiff called Coffey and told Coffey he felt fine and wanted to come back to work.  (Edwards Dep. at 103:1-3.)

When Plaintiff returned to work the following week, in or about August 30, 2010, Plaintiff was assigned to light duty consisting of operating a dump truck on-site as an accommodation for his back injury.  (Def.'s Statement of Material Facts ¶ 50; Def.'s Ex. B, Def.'s Response to Interrogatory 12.)  In addition, Coffey left the employment of Panther around late August or early September 2010, and when Plaintiff returned to work, he was supervised by Robert Foley. (Pl.'s Counter Statement of Material Facts ¶ 7; Edwards Dep. at 105:18-24.)

On September 7, 2010, Plaintiff found out that he would need an epidural injection for his back.  (Edwards Dep. at 162:12-16.) Plaintiff testified that he made an appointment for September 22, 2010 to have the injection and arranged to have the day off of work.  Plaintiff also testified that he spoke with Jack Twomey,

vice president of Panther, on September 17, 2010 about his
medical appointment for the injection.  (Edwards Dep. at 132:15-
25.) Plaintiff has produced no records of any request for leave
and Defendants deny that Plaintiff requested the time off. (Palko
Dep. at 83:6-86:14.)  It was company policy for employees to fill
out request forms to take a day off, and there is no record that
Plaintiff filled out a request form.  (Palko Dep. at 18-20.)

    At the end of the day on September 20, 2010, Plaintiff's
project manager on-site informed Plaintiff that he needed to meet
with Jack Twomey, vice president of Panther, at 9:00AM the next
morning.  (Edwards Dep. at 130:22-24.)  Plaintiff arrived at the
meeting the next day and Defendant Palko and Mr. Foley,
Plaintiff's new supervisor, were present.  Mr. Twomey was not in
attendance.  (Edwards Dep. at 131:7-13.)

    During this meeting, according to the Plaintiff, Defendant
Palko stated that "my back being injured, I am no good for
Panther anymore, and that he had gotten reports that I want to go
and work for someone else, and that my license is no good, so you
know, basically, you can go where the – - you want to go."
(Edwards Dep. at 132:4-9.)  Plaintiff testified that Defendant
Palko fired him at this meeting.  (Edwards Dep. at 133:10-22.)

    Defendants dispute that Palko said this to the Plaintiff and
that the Plaintiff was terminated at the September 21, 2010
meeting.  To the contrary, Defendants state that the purpose of

the September 21, 2010, meeting was to address Plaintiff's lack
of a valid driver's license.  Defendant Palko testified in his
deposition that during the meeting, he stated to the Plaintiff
that, "if you don't have a valid driver's license, you're no good
to us as a driver" and that Plaintiff's medical condition was
never discussed.  (Palko Dep. at 89:23-90:4.)  Defendant Palko
testified that he told the Plaintiff "you have five days to
produce a valid driver's license or you're no longer going to be
employed at Panther."  (Id. at 89:7-9.)

    During the meeting, Defendants claim Plaintiff acknowledged
that he had lost his driver's license, but provided no detail or
explanation other than he did not file the DMV paperwork to allow
for the issuance of a work license in a timely manner and
therefore had to wait six more months before he could obtain
another license.  Defendants maintain that Plaintiff was given
one week to obtain a valid driver's license or else be
terminated.  Defendants claim that Plaintiff never disclosed to
them that his license had been suspended for a year because of a
DUI.  (Pl.'s Ex. B, Def.'s Response to Interrogatory No. 4; Palko
Dep. at 89:2-90:12.)  The Plaintiff verified in his deposition
testimony that he never disclosed his DUI to Defendant Palko and
that he did not explain to Defendant Palko that his license was
suspended for a year.  (Edwards Dep. at 142:12-25.)

    The Plaintiff also testified during his deposition that he

told Defendant Palko during the September 21, 2010 meeting that
he needed to get an epidural injection the next day for his back.
(Edwards Dep. at 159:23-160:6.)  Plaintiff explained that he
informed Defendant Palko about his injection in the middle of the
meeting.  Plaintiff first testified that he told Defendant Palko
"after he was terminated" and later testified that he "said it
before I was terminated."  (Edwards Dep. at 160:16-23.)  In
response, Defendant Palko did not say anything.  (Edwards Dep. at
160:21-23.)

     Plaintiff did not return to work for Panther after the
September 21, 2010 meeting.  Plaintiff filed for unemployment
benefits on or about September 26, 2010 and was deemed to have
voluntarily left his position as a Field Technician with Panther.
(Def.'s Ex. K, Unemployment Benefits Records.)  Specifically, the
New Jersey Department of Labor found:

> You were employed in a position which required a valid
> driver's license as a prerequisite of employment.  Your
> position was solely dependent on possession of this
> license.  Employment ended when you lost this license for
> committing a voluntary act.  You were aware that your
> actions could jeopardize your license.  Therefore, your
> separation is considered to be a voluntary quit without
> good cause attributable to the work.   You are
> disqualified for benefits.

Id.

     The Plaintiff filed this action on October 8, 2010 against
Defendants Panther and Palko.  [Docket Item 1.]  The Plaintiff
brings two causes of action under the NJLAD.  First, the

Plaintiff argues the Defendants unlawfully discriminated against him on the basis of his disability, specifically his back injury. Second, the Plaintiff argues the Defendants unlawfully retaliated against him for requesting time off work for his epidural injection.

The Defendants filed the instant motion for summary judgment.

### B. The Instant Motion

The Defendants argue that summary judgment is appropriate as to both counts of Plaintiff's complaint.  As to the discrimination claim, Defendants maintain the Plaintiff cannot establish a prima facie case.  In particular, the Defendants argue the Plaintiff cannot show he was qualified for the position since he did not have a valid driver's license.  In addition, Defendants maintain that they provided the Plaintiff with a reasonable accommodation due to his medical condition because the Defendants sent Plaintiff to a physician, gave Plaintiff a week off of work and assigned Plaintiff to light duty when he returned.  Further, the Defendants note that the Plaintiff never formally reported an injury.

With regards to Plaintiff's retaliation claim, the Defendants argue summary judgment is appropriate because the Plaintiff has produced no evidence that he was discharged in retaliation for seeking time off for treatment.  Finally, the

Defendants argue Plaintiff's claims against Defendant Palko should be dismissed because the Plaintiff cannot demonstrate individual liability under the NJLAD for aiding and abetting discrimination.  Specifically, the Defendants contend that the Plaintiff has produced no evidence that Palko had an intent to discriminate and instead the record shows that Palko did not know about Plaintiff's need for an epidural injection until the meeting on September 21, 2010.

Therefore, the Defendants argue summary judgment should be granted and Plaintiff's complaint should be dismissed.

The Plaintiff opposes Defendants' motion and argues that he has presented genuine issues of material fact that prevent summary judgment.  First, the Plaintiff maintains that he is entitled to a direct evidence jury instruction with regard to his disability discrimination claim and this warrants an automatic denial of summary judgment.  Plaintiff argues that Defendant Palko's statement "you're no good to me anymore" because of Plaintiff's back condition is direct evidence of disability discrimination.

Even if the court were to apply the *McDonnell Douglas* analysis, the Plaintiff argues he has presented sufficient evidence that he was qualified for his position as a Field Technician despite lacking a driver's license because he was actually performing the job at the time he was terminated.  In

16

addition, Plaintiff argues that the Defendants waived any requirement for a valid driver's license since the Defendants acquiesced in allowing Plaintiff to work as a Field Technician when they knew he did not possess a valid license.  Further, the Plaintiff argues that there is a genuine issue of material fact as to whether he was terminated from his position or voluntarily quit.

The Plaintiff also argues that the Defendants' position is inherently contradictory and therefore summary judgment should be denied.  Specifically, Plaintiff argues that Defendants' claim that Plaintiff voluntarily left his position is inconsistent with the claim that Plaintiff was terminated because he lacked a valid driver's license.  Since these positions contradict one another, Plaintiff maintains Defendants' motion should be denied.

As to the retaliation claim, the Plaintiff contends that he has presented sufficient evidence to show that he was terminated for requesting a day off work to receive treatment for his back condition.  The Plaintiff also argues that there is enough evidence to show Defendant Palko is personally liable for aiding and abetting the discriminatory termination of the Plaintiff.

Therefore, the Plaintiff maintains that summary judgment should be denied.

In reply, Defendants maintain that the Plaintiff is not entitled to a direct evidence analysis under the *Price Waterhouse*

framework because Palko's statement alone is not sufficient. Further, Defendants argue that the evidence shows Plaintiff actively misled the Defendants about the status of his license and never disclosed his DUI conviction.  Therefore, the Defendants argue they cannot be deemed to have waived the license requirement for Plaintiff's position.

In addition, Defendants argue that the record indicates Plaintiff did not raise the need for time off work for his epidural injection until the September 21, 2010 meeting was in progress and there is no evidence that Plaintiff requested time off work prior to this meeting.  Consequently, Defendants contend that there is no evidence Plaintiff engaged in protected activity and Plaintiff cannot establish his retaliation claim.

Further, the Defendants argue that the only reason Defendant Palko is being sued in this case is because he was the one that terminated the Plaintiff.  This is insufficient for individual liability under the NJLAD and therefore, the Defendants maintain that summary judgment should be granted as to all claims against Defendant Palko.

Finally, Defendants argue that their position regarding Plaintiff's separation from Panther is not inconsistent. Defendant's maintain that the Plaintiff was told on September 21, 2010 that he had one week in which to get a valid driver's license or else he would be fired.  Defendants claim that instead

18

of disclosing his DUI conviction and telling Defendants that he could not get a valid license, Plaintiff chose to abandon his position.  Therefore, Plaintiff was considered terminated when he did not come back to work after the September 21, 2010 meeting and Defendants' position is not inconsistent.

Both parties filed sur-replies which reiterated their initial arguments in their briefs.  The Plaintiff maintains that the protected activity underlying his retaliation claim was his request for time off work for health problems in 2010.  The Defendants countered by stating that the Plaintiff never formally requested time off work for his epidural injection and that the Plaintiff testified in his deposition that he was never denied leave for medical reasons.  Therefore, Defendants argue that there is no evidence of protected activity to trigger Plaintiff's retaliation claim.

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

fact is "material" only if it might affect the outcome of the
suit under the applicable rule of law. Id. Disputes over
irrelevant or unnecessary facts will not preclude a grant of
summary judgment. Id. The Court will view any evidence in favor
of the nonmoving party and extend any reasonable favorable
inferences to be drawn from that evidence to that party. Hunt v.
Cromartie, 526 U.S. 541, 552 (1999). See also Scott v. Harris,
550 U.S. 372, 378 (2007) (The district court must "view the facts
and draw reasonable inferences in the light most favorable to the
party opposing the summary judgment motion.").

**B. Discrimination Claim**

The NJLAD makes it unlawful for an employer to discriminate
against an employee on the basis of an employee's disability.
More specifically,

> All of the provisions of the [NJLAD] ... shall be
> construed to prohibit any unlawful discrimination against
> any person because such person is or has been at any time
> disabled or any unlawful employment practice against such
> person, unless the nature and extent of the disability
> reasonably precludes the performance of the particular
> employment.

N.J. Stat. Ann. § 10:5-4.1.

Prior to deciding whether disability discrimination
motivated Plaintiff's alleged discharge, the Court must first
determine which analytical framework controls the claim. "This
determination is predicated upon whether the evidence of
discrimination is 'direct' or 'indirect.'" Davis v. Atlantic

League of Professional Baseball Clubs, Inc., 2009 WL 1545844,
Civ. No. 07-5023 (D.N.J. June 2, 2009).  If a plaintiff relies on
"direct evidence," the analysis set forth in Price Waterhouse v.
Hopkins, 490 U.S. 288 (1989), is appropriate.  If a plaintiff
relies on "indirect, or circumstantial evidence of
discrimination" the burden shifting frame work established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies.
Id.; see also Glanzman v. Metro. Mgt. Corp., 391 F.3d 506, 512
(3d Cir. 2004).  In order to establish a prima facie case of
discrimination under the LAD pursuant to the *McDonnell Douglas*
framework, a party must show: (1) he is a member of a protected
class; (2) he was qualified for his position; (3) he was fired;
and (4) employees not in that protected class were treated more
favorably.  See e.g., Turner v. Schering-Plough Corp., 901 F.2d
335, 342 (3d Cir. 1990).

In the alternative, "[w]hen an employee attempts to prove
discrimination by *direct evidence,* the quality of evidence
required to survive a motion for summary judgment is that 'which
if believed, proves [the] existence of [a] fact in issue *without
inference or presumption.*'"  Bergen Commercial Bank v. Sisler,
157 N.J. 188, 209, 723 A.2d 944, 954 (1999) (quoting Castle v.
Sangamo Weston, Inc., 837 F.2d 1550, 1558 n. 3 (11th Cir. 1988)).
In the NJLAD wrongful discharge context, the employee must show
direct evidence that decision makers placed "substantial negative

21

reliance on an illegitimate criterion," and the evidence, if proven, must show both the employer's hostility toward the plaintiff's class and a causal connection between the hostility and the employee's discharge.  Id.  (citations omitted).

In the Third Circuit, direct evidence has been interpreted as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the plaintiff's [disability]] in reaching their decision to fire him."  Fakete v. Aetna, 308 F.3d 335, 338 (3d Cir. 2002) (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)).  Moreover, "statements of a person involved in the decision making process that reflect a discriminatory or retaliatory animus of the type complained of in the suit," constitute direct evidence, even if those statements are not made at the time and place of the alleged wrongful discharge.  Id. at 339 (citing Hook v. Ernst & Young, 28 F.3d 366, 374 (1994)).

The court finds the Third Circuit decision in Fakete v. Aetna instructive.  In Fakete, an employee, a fifty-six year old audit consultant, alleged his superior told him "the new management ... wouldn't be favorable to [him] because they are looking for younger single people that will work unlimited hours and that [he] wouldn't be happy there in the future."  Fakete, 308 F.3d at 336.  A few months later, the employee was fired, allegedly for unexplained absences, falsified expense reports and

22

failure to pay for personal phone calls.  Id.  The employee
brought suit against the employer in the United States District
Court for the Eastern District of Pennsylvania alleging he was
terminated in violation of the Age Discrimination in Employment
Act.  Id. at 337.  The employee claimed, and the Third Circuit
agreed, that the superior's statement, taken alone, was
sufficient to constitute direct evidence of discrimination under
Price Waterhouse.

The Third Circuit concluded that the alleged statement,
viewed favorably to the employee, was not a "a stray remark that
did not directly reflect the decisionmaking process of any
particular employment decision," but rather it represented a
"clear, direct warning to [the employee] that he was too old to
work for [the employer], and that he would be fired soon if he
did not leave ... on his own ...."  Id. at 339.

In the instant case, Plaintiff alleges that Defendant Palko,
Panther's General Manager, explicitly told Plaintiff during the
September 21, 2010 meeting that he was "no good for Panther
anymore" because of his "back being injured." (Edwards Dep. at
132:4-9.)  Though the Defendants contend that such a statement
was never uttered and that Plaintiff was not fired but
voluntarily abandoned his position, the Court must give all
reasonable inferences to the Plaintiff and view the statement in

the light most favorable to him in deciding a motion for summary judgment.

Defendant Palko's alleged statement, standing alone, demonstrates negative reliance on an illegitimate criterion, Defendant Palko's animus toward Plaintiff's class, and a causal connection between Defendant's animus and Plaintiff's termination and consequently cannot be deemed a stray remark.  In particular, "stray remarks in the workplace, unrelated to the decisional process, [are] not sufficiently direct evidence of discrimination to justify" shifting the burden to the employer "to prove that its ... decisions were based on legitimate criteria." Geltzer v. Virtua West Jersey Health Systems, 804 F. Supp. 2d 241, 250 (D.N.J. 2011) (quoting Sisler at 208, 723 A.2d 944).  However, in the instant case, Defendant Palko's statement was directed at the Plaintiff in the context of a termination meeting.  Because of Defendant Palko's position as General Manager and the alleged purpose of the meeting, his comment cannot be considered "stray" or "unrelated to the decisional process."

Therefore, a rational jury could find Defendants placed substantial negative reliance on Plaintiff's disability when the employment decision was made, and Plaintiff has satisfied his burden and presented direct evidence.

Under the direct evidence analysis, if a plaintiff employee is able to meet this "rigorous burden ... the burden then shifts

to the employer to show it would have made the same decision even in the absence of the impermissible consideration." Sisler at 209. This process is the so-called "mixed motive analysis," which states that, while an employer cannot make discriminatory employment decisions, the employer is "free to decide against an employee for 'other reasons.'" Id. "This is a high burden on a motion for summary judgment because [the defendant] must leave no doubt that a rational jury would find [the employer] would have fired [the employee] even if it had not been for the discriminatory statement." Glanzman v. Metro Mgmt. Corp., 391 F.3d 506, 514 (3d Cir. 2004).

In the instant case, Defendants claim that the Plaintiff would have been fired in the absence of any back injury because he failed to maintain a valid driver's license. According to Defendant Palko, the purpose of the September 21, 2010 meeting was to "place Mr. Edwards under threat of discharge" by giving him five days to produce either a valid driver's license or a plan for obtaining a valid license. (Palko Dep. at 89:2-20.) Mr. Palko's testimony is corroborated by the testimony of Robert Foley, who was employed as Panther Technology's Operations Manager when the meeting occurred. (Def.'s Ex. M, Deposition of Thomas Foley on October 28, 2011 (hereinafter "Foley Dep.") at 8:16-20.) According to Mr. Foley, the Plaintiff was called in to discuss "a couple of issues in regards to his driver's license."

25

(Id. at 16:15-18.)   Mr. Foley also claims the Plaintiff was not terminated on September 21, 2010, but was warned that "he had a week to produce a driver's license or come up with a real good game plan." (Id. at 16:19-21.)

Though Plaintiff denies he was given a week to obtain a valid driver's license or present Mr. Palko with a plan for obtaining one (Edwards Dep., Pl. Ex. A 135:15-25), he admits that he would have been unable to get a valid driver's license within that period because his license was suspended after he received his third DUI conviction.  Id. at 142:10-11.  Additionally, Plaintiff did not inform Mr. Palko and Mr. Foley that he could not get his license reinstated for the time period of his DUI suspension. Id. at 142:19-25.

Finally, even Plaintiff's testimony mentions that his lack of a valid driver's license was a topic of the meeting. (Edwards Dep. at 132:7, 135:5-12).  Specifically, Plaintiff testified that during this meeting, Defendant Palko told him that "my back being injured, I am no good for Panther anymore, and that he had gotten reports that I want to go and work for someone else, and **that my license is no good**, so you know, basically, you can go where the – – you want to go." (Edwards Dep. at 132:4-9)(emphasis added). Plaintiff testified later in his deposition that his failure to have a valid driver's license was discussed "during that meeting." (Edwards Dep. at 135:5-8.)

26

The court finds that there is no genuine dispute that possessing and maintaining a valid driver's license was required for continued employment at Panther and Plaintiff was aware of this requirement.  First, the "Application for Employment" form signed by Plaintiff on October 5, 2007 clearly states, "[A] valid driver's license is required for employment with the Company. Once employed, you will be responsible to maintain a valid driver's license. In the event there are changes to your driver's license, you must notify the Company immediately."  (Def. Ex. D.) Moreover, while Plaintiff was offered a field technician position despite his lack of a valid driver's license, the "Offer of Employment" presented to the Plaintiff on October 5, 2007, contained a provision specific to Plaintiff's status:

> You will be required to get your driver's license reinstated within 90 days and must maintain it in good standing in order to continue your employment with Panther.  You can not [sic] operate a company vehicle until after your license has been reinstated. Your driver's license will be checked bi-annually to ensure such compliance.

(Def. Ex. A.)

Next, the Plaintiff also received numerous warnings about his lack of a valid driver's license, some of which appeared in writing.  An "Employee Review Form" dated July 9, 2008 states, "[Mr. Edward's] lack of a driver's license is a major problem and will continue to keep him from reaching his full potential." (Def. Ex. I.)

27

Giving all favorable inferences to the Plaintiff, the record clearly demonstrates that possession and maintenance of a valid driver's license was mandatory for full time employment at Panther, and Plaintiff was fully aware of this requirement. Therefore, Plaintiff's failure to possess and maintain a valid driver's license constitutes a legitimate reason to fire him.[1]

The Plaintiff argues the Defendants waived the requirement for a valid driver's license as to the Plaintiff because the Defendants knew the Plaintiff did not have a valid license for 20 of the 36 months he worked for Panther and failed to terminate him.  The court finds this argument unpersuasive.  First, while the Plaintiff was hired in October 2007, he did not attain full time status and he was not allowed to operate company vehicles until he received his valid driver's license in September 2008. Far from waiving the license requirement, from October 2007 through September 2008, the record shows that the Defendants

_____

[1] Mr. Palko and Mr. Foley raised two additional disciplinary issues with Plaintiff at the September 21, 2010 meeting. First, Mr. Foley allegedly observed Plaintiff sleeping in a Panther dump truck while visiting a work site.  (Foley Dep. at 22:22.) According to Mr. Foley, he informed the site manager and told the site manager to wake Plaintiff.  Id. at 22:22-23.  Additionally, Plaintiff was allegedly "talking ... negatively about the company, saying that he was leaving the company to join Mr. Coffee in his position ...."  (Palko Dep. at 60:13-17.)  During his deposition, Plaintiff confirmed that these disciplinary matters were raised at the September 2010 meeting.  (Edwards Dep. at 134:2-15.)  While these issues were not the primary focus of the meeting, they constitute additional reasonable grounds for dismissal.

enforced the license requirement and were monitoring Plaintiff's progress in attaining a driver's license.

More significantly, the Plaintiff was charged with a DUI offense in November 2008, approximately two months after he received his Pennsylvania driver's license.  Instead of disclosing this offense to the Defendants, the Plaintiff concealed this offense until February 2010, more than a year after his DUI charge and three months after his license had been suspended in December 2009.  In addition, the Plaintiff lied to the Defendants about why his license was suspended by telling his supervisor, John Coffey, that it was "because of his car."  It is undisputed by the parties that until this litigation, the Defendants did not know that Plaintiff's license was suspended because of a DUI conviction and instead believed the Plaintiff lost his license due to vehicular title and registration issues.

Once the Plaintiff disclosed his lack of license to the Defendants in February 2010, the Defendants worked with the Plaintiff to obtain a temporary license.  The Plaintiff was also prohibited from operating any off-site vehicles.  The record also shows that Defendant Palko and Coffey spoke with the Plaintiff on multiple occasions regarding the status of his license.  This clearly demonstrates that the license requirement was not waived; but rather, the Defendants were working with the Plaintiff to

obtain a valid license and were deceived by the Plaintiff as to
the real reason of his license suspension.

The Plaintiff cannot now argue that the Defendants waived
their right to enforce the license requirement in the employment
agreement.  It is clear from the record that the reason the
Defendants delayed in terminating the Plaintiff was because the
Plaintiff intentionally lied to the Defendants about his DUI
conviction and led the Defendants to believe that his license
could be reinstated without a problem.  The Plaintiff cannot now
rely on his deceitful conduct and argue waiver.  Such a result
would be inequitable and reward employees for intentionally
deceiving their employers about an important public safety aspect
of their position.

The court's conclusion is further supported by the decision
of the New Jersey Department of Labor and Workforce Development
("NJDLWD").  The report issued by the NJDLWD, dated October 25,
2010, shows that Plaintiff was denied unemployment benefits
because he "left work voluntarily on 9/20/2010 [sic]."  Def. Ex.
K.  The report goes on to say,

> You were employed in a position which required a valid
> driver's license as a prerequisite of employment.  Your
> position was solely dependent on possession of this
> license.  Employment ended when you lost this license
> for committing a voluntary act.... [Y]our separation is
> considered to be a voluntary quit without good cause
> attributable to the work. You are disqualified for
> benefits.

Id.

While an unemployment decision is not conclusive and should not be given deference by the court, it is still relevant in reviewing the record.  Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 529 (2006)(holding that unemployment compensation determinations should not be given collateral estoppel effect); Gibbs v. Caswell-Massey, No. 07-3604, 2011 WL 4974727 at *6 (N.J. Super. Ct. App. Div. Oct. 20, 2011).  As part of the record before a rational jury, the report states that a valid driver's license was a prerequisite to Plaintiff's employment, and when viewed in conjunction with the other evidence in the record, the Court concludes that there is no genuine issue of material fact that a driver's license was required for Plaintiff's continued employment at Panther and failure to obtain one is a valid reason for Plaintiff's termination.

Therefore, the Court concludes that the Defendants have met their high burden on summary judgment and that there is no doubt that a rational jury would find the Defendants would have fired the Plaintiff even if it had not been for Defendant Palko's statement regarding Plaintiff's back.  There is no doubt that a rational jury would find that the Plaintiff would have been fired regardless of this statement because he lacked a valid driver's license which was a prerequisite for his employment.

Accordingly, the Court finds that Defendants' summary judgment motion must be granted.  No rational jury could doubt

31

that Panther would have terminated the Plaintiff even if it had not considered his alleged disability, because the record is clear that the Plaintiff lacked a valid driver's license which was a prerequisite to his employment at Panther and that the Plaintiff intentionally deceived the Defendants about his DUI charge from November 2008 through the end of his employment on September 21, 2010.

### C.  Retaliation Claim

In addition to his discrimination claim, the Plaintiff brings an unlawful retaliation claim against the Defendants under the NJLAD.  The Plaintiff argues that he engaged in protected activity by requesting time off from work to receive his epidural injection and that he was terminated for requesting this time off.  The Plaintiff maintains that previously he had taken a week off from work because of his back pain and that prior to the September 21, 2010 termination meeting, Plaintiff informed Jack Twomey, owner and Vice President of Panther, that he would need to take a day off of work for the epidural injection.  The court finds this insufficient to sustain a claim for retaliation.

A plaintiff must allege three elements in order to establish a prima facie case of retaliation in violation of the NJLAD, namely: (1) the employee engaged in a protected activity; (2) the employee was subjected to an adverse employment action; (3) there is a causal connection between the protected activity and the

adverse employment action.  Woods-Pirozzi v. Nabisco Foods, 290
N.J. Super. 252, 274 (App. Div. 1996).  "The first prong and the
central element of a retaliatory discharge claim under LAD is
that the plaintiff be engaged in a protected activity which is
known by the alleged retaliator."  Young v. Hobart West Group,
385 N.J. Super. 448, 465 (App. Div. 2005).

There is no evidence in the record that the Plaintiff
opposed any practice made unlawful by the NJLAD.  There is also
no evidence in the record that the Plaintiff submitted a formal
request to take a day off of work.  The evidence shows that it
was company policy for employees to fill out request forms to
take a day off, and there is no record that Plaintiff filled out
such a request form.  (Palko Dep. at 18-20.)

The only evidence presented by the Plaintiff is that he
spoke with Jack Twomey, who was not his direct supervisor, on
September 17, 2010, about his medical appointment for his
injection.  The Plaintiff also testified that in the middle of
the September 21, 2010 meeting, Plaintiff informed Defendant
Palko that he would need the following day off to get an
injection for his back and Defendant Palko did not respond.  This
is insufficient to support a retaliation claim.

Informal requests to attend doctor's appointments without
more does not constitute protected activity under the LAD.  See
Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 584 (D.N.J.

33

2005)(holding that an employee does not establish a retaliation claim for disability by merely alleging "she was recently diagnosed with COPD and she might need to attend doctors' appointments in the future").  In this case, employees were required to fill out formal request forms to request time off and Plaintiff did not do so.  Plaintiff further testified that he had never been denied leave to go to a medical appointment or seek time off for a medical reason prior to his termination.  The Plaintiff never protested or complained that the Defendants' policy for requesting time off of work was unfair or in violation of the NJLAD.

Moreover, while Plaintiff did previously take a week off of work for his back in August 2010, this leave of absence was done at the behest of the Defendants.  The Defendants observed Plaintiff in pain and immediately made an appointment for Plaintiff to see the company physician.  The Defendants then insisted Plaintiff take a week off of work to seek further medical attention, which the Plaintiff did not do.  The Plaintiff instead called repeatedly to come back to work.  Upon returning to work, the Plaintiff was assigned to light duty to accommodate Plaintiff's back pain.  There is no evidence that the Defendants ever denied Plaintiff leave or that Plaintiff's discussion with Jack Twomey about his injection had anything to do with the September 21, 2010 meeting.

34

Indeed, the Plaintiff testified that he did not inform Defendant Palko or his supervisor Robert Foley that he needed the following day off of work for his epidural injection until the middle of the September 21, 2010 meeting.  The Plaintiff initially testified that at the time he informed Defendant Palko about his need to take the following day off of work he was already terminated.  The Plaintiff later contradicted himself and testified that he was terminated after he informed Defendant Palko about his medical appointment.  Regardless, there is no logical way that a rational jury could conclude the September 21, 2010 meeting was held because of the Plaintiff requesting time off of work since the Plaintiff did not inform the Defendants about his need for time off until the meeting was well underway.

Therefore, the court concludes that no rational jury could find that the Plaintiff was engaged in a protected activity at the time he was terminated.  The Plaintiff has presented no evidence that he formally requested time off of work for his medical appointment.  The previous week of leave time was insisted upon by the Defendants over the Plaintiff's objection. The Plaintiff has also presented no evidence of being denied leave for medical reasons in the past.  Finally, Plaintiff did not engage in any protest of Defendants' policies regarding medical leave.

Accordingly, summary judgment will be granted and Plaintiff's retaliation claim will be dismissed.[2]

**IV.  CONCLUSION**

For the reasons discussed about, Defendants' motion for summary judgment will be granted and the Plaintiff's complaint will be dismissed.  The accompanying Order will be entered.

**November 19, 2012**        **_s/ Jerome B. Simandle_**
Date                              JEROME B. SIMANDLE
                                             Chief U.S. District Judge

---

[2] Since the court has determined that both Plaintiff's disability discrimination claim and retaliation claim should be dismissed on summary judgment, the court does not need to determine whether Defendant Palko can be held individually liable under the NJLAD.

36